Jeremy L. Bordelon, OSB No. 160789
jeremy@evergreendisability.com
Evergreen Disability Law
465 Northeast 181st Ave., No. 500
Portland, Oregon 97230
(503) 888-9331

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| NORMA JEAN STEPHENS, | Civil No. 3:20-cv-00075-SI |
| Plaintiff, | |
| v. | MOTION FOR JUDGMENT ON THE RECORD (FRCP 52) |
| STANDARD INSURANCE COMPANY, | |
| Defendant. | Oral Argument (telephonic) Requested |

**MOTION**

Pursuant to Federal Rule of Civil Procedure 52(a) and 29 U.S.C. Section 1132(a)(1)(B), Plaintiff Norma Stephens hereby moves for judgment with issuance of findings of fact and conclusions of law based upon the record filed by Defendant Standard Insurance Company and her accompanying Memorandum of Law.

**LR 7.1 CERTIFICATION**

Pursuant to LR 7.1(a)(1)(A), the parties have made a good faith effort to resolve this dispute, however, they have been unable to do so. Defendant Standard Insurance Company opposes this motion.

PLAINTIFF'S MOTION FOR JUDGMENT          1

**TABLE OF CONTENTS**

MOTION                                                                    1

LR 7.1 CERTIFICATION                                                      1

TABLE OF CONTENTS                                                         2

TABLE OF AUTHORITIES                                                      3

MEMORANDUM OF LAW                                                         6

I.      FACTUAL BACKGROUND                                                6
        A.      Medical History                                          6
        B.      Claim History                                            10

II.     LAW & ARGUMENT                                                    14

        A.      Standard of Review                                       14
                1.      Standard's financial conflict affected Ms. Stephens's claim    16
                2.      Standard's sole reliance on medical record reviews raises       19
                        questions of accuracy and thoroughness
                3.      Standard's reliance on Dr. John Hart to support its final        21
                        denial was flawed

        B.      Relevant Plan Terms                                       24

        C.      Ms. Stephens Has Proven Her Continuing Disability          25
                1.      The severity of Ms. Stephens's condition is supported by        25
                        the evidence of her treatment
                2.      Ms. Stephens could not sit enough to perform sedentary work 27

        D.      Standard Improperly Terminated Ms. Stephens's Disability Benefits  28
                1.      Standard abused its discretion in denying this claim without    29
                        an in-person examination
                2.      Standard abused its discretion in relying on Dr. Hart            32

        E.      Remedy Should Be Reinstatement of Benefits                35

III.    CONCLUSION                                                       36

**TABLE OF AUTHORITIES**

**Cases**

*Abbott v. Astrue*, 391 F. Appx. 554 (7th Cir. 2010)                          27

*Alfano v. CIGNA Life Ins. Co. of New York*, 2009 WL 222351 (S.D.N.Y. Jan. 30, 2009)    28

*Armani v. Northwestern Mutual Life Ins. Co.*, 840 F.3d 1159 (9th Cir. 2016)      22, 29

*Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547 (6th Cir. 2008)           31

*Brigham v. Sun Life of Canada*, 317 F.3d 72 (1st Cir. 2003)                  28

*Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x. 544 (6th Cir. 2006)   28

*Brown v. Continental Casualty Co.*, 243 F. Supp. 2d 321 (E.D. Pa. 2003)        35

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286 (6th Cir. 2005)                 21

*Canseco v. Constr. Laborers Pension Trust*, 93 F.3d 600 (9th Cir. 1996)        37

*Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004)                        27

*Conkright v. Frommert*, 559 U.S. 506 (2010)                                14

*Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127 (2nd Cir. 2001)    28, 34

*Constantino v. Aetna Life Ins. Co.*, 2014 WL 5023222 (C.D. Cal., Oct. 8, 2014)   21

*Cooper v. Life Ins. Co. of N. Amer.*, 486 F.3d 157 (6th Cir. 2007)            37

*Culley v. Liberty Life Assurance Co.*, 339 F. App'x 240 (3d Cir. 2009)        32

*Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640 (7th Cir. 2007)            27

*Ferguson v. Hartford Life & Accident Ins. Co.*, 268 F. Supp. 2d 463 (E.D. Pa. 2003)   32

*Flanigan v. Liberty Life Assur. Co. of Boston*, 277 F. Supp. 2d 840 (S.D. Ohio 2003)   27

*Fleet v. Independent Federal Credit Union*,                                 37
2005 WL 1183177 (S.D. Ind. May 18, 2005)

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)                   14

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)     16

*Honda v. Sunshine Biscuit Long Term Dis. Plan*, 125 F.3d 858 (9th Cir. 1997)     35

*Jani v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,     32
209 F. App'x 305 (4th Cir. 2006)

*Judd v. Qwest Communs. Int'l*, 2012 WL 3704703 (D. Ariz., Aug. 28, 2012)     21

*Judi W. v. Saul*, 2019 WL 3237513 (D. Or. July 18, 2019)     27

*Kaviani v. Reliance Standard Life Ins. Co.*, 799 F. App'x 753 (11th Cir. Jan 31, 2020)     36

*Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182 (C.D. Cal. 2008)     20, 29

*Lee v. Kaiser Found. Health Plan Long Term Disability Plan*,     15
563 F. App'x 530, (9th Cir. 2014)

*Lin v. Metro. Life Ins. Co.*, 2016 WL 4373859 (N.D. Cal. Aug. 16, 2016)     32

*Medefesser v. MetLife*, 2019 WL 6481794 (D. Or. Sep. 5, 2019)     35

*Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008)     16, 17, 19

*Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168 (D. Nev. 2008)     18, 19

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623 (9th Cir. 2009)     21, 27

*Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112 (D. Or. 2013)     21, 31

*Proctor v. Astrue*, 665 F. Supp. 2d 1243 (D. Colo. 2009)     27

*Robertson v. Standard Ins. Co.*, 139 F. Supp. 3d 1190 (D. Or. 2015)     15, 22, 29

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011)     14, 15, 16, 17, 21, 22, 32

*Yancy v. United of Omaha Life Ins. Co.*, 2015 WL 9311729 (C.D. Cal. Dec. 18, 2015)     35

**Statutes and Regulations**

29 U.S.C. §1104(a)(1)     16

**Other Citations**

Ana C. Siquara de Sousa, et al., Magnetic resonance imaging evidence    7
for perineural spread of endometriosis to the lumbosacral
plexus: report of 2 cases, 39 Neurosurg. Focus (3):E15 (2015)

Medline Plus, Clonazepam, https://medlineplus.gov/druginfo/    9
meds/a682279.html

Medline Plus, Topiramate, https://medlineplus.gov/druginfo/    9
meds/a697012.html

Medline Plus, Promethazine, https://medlineplus.gov/druginfo/    9
meds/a682284.html

Medline Plus, Methocarbamol, https://medlineplus.gov/druginfo/    9
meds/a682579.html

## MEMORANDUM OF LAW

I.     **FACTUAL BACKGROUND**

A.     **Medical History**

Norma "Jean" Stephens was 51 years old on her last day of work, June 3, 2015. AR 0104.[1] She was originally hired to work for the Harbin Clinic in the Atlanta area in 1997, and had worked there for over 18 years as the clinic's Credentialing Manager. *Id.* That job was determined by Standard to be "Light" exertion work. AR 0854-56.

Ms. Stephens explained the history of her disability to a Standard representative in a phone interview at the outset of her claim. AR 0839-40. She explained that she had had an emergency hysterectomy in December of 2013 due to a ruptured uterine cyst. "[O]nce they got her open they found the cysts on her uterus had grown into her intestines and the surgery was much more extensive than originally anticipated." *Id.* Following that hysterectomy, Ms. Stephens struggled with "ongoing pain in her abdomen, legs and back." She said that "the pain in her abdomen increased with sitting for long periods of time and the pain in her legs and back was increased by standing." *Id.* When asked about her current activities, Ms. Stephens reported she was no longer able to attend church "due to the sitting and was most comfortable laying down." *Id.* One record from June of 2014 contains a similar history:

> [S]he had a UTI and flare of interstitial cystitis in october [of 2013]; had some spotting/bleeding and spoke to urology. She reports that she started to have contraction/spasm into lower back. During that evaluation she went to gyn and told that she had a ruptured fibroid tumor and lining of uterus "ripped." she had surgery 12/3[/2013] and told that she had a very enlarged uterus and some grew towards intestine. Most of the fibroids were left sided.

---

[1] All citations to the ERISA claim file, or "Administrative Record," will follow this format, citing to the last four digits of the page numbers found on the record Standard filed with the Court using the numbers as "STND 20-04925-00XXXX."

AR 0362.

Ms. Stephens's pain continued after this note. Her pain management physician, Dr.

Richard Donadio, wrote in May of 2015 that "She has increased low back and leg pain." AR

0421. "She reports her pain is burning and she feels like she is on fire." "Her pain started

shortly after the [hysterectomy] surgery but has gotten worse since the surgery." "She

reports when she sit[s] for long periods of time her pain increases." *Id.* Dr. Donadio

reported his impressions as follows:

> Patient continues to have pain that is multifactorial. Again, I am not sure
> where this is coming from but feel it is intrapelvic for the most part and
> possibly to a lesser extent and less likely the spine. Likely scar tissue and
> adhesions affecting the lumbosacral plexes.[2]

AR 0422. At that time, early May 2015, Ms. Stephens was still working. Shortly after that, on

June 5, 2015, she tried another surgery, hoping that a laparoscopic surgery to remove any

remaining abdominal adhesions would alleviate her pain. AR 0516.

> 51-year-old... with previous [hysterectomy] in December of 2013. Since that
> time she's had some issues with left-sided pelvic pain. She describes the pain
> as shooting from the front to back of the left pelvic area with some pain down
> into her legs which causes tingling and cramping. She's been seen by pain
> management and rheumatology with minimal success finding her problem....
> She is here to discuss whether or not a laparoscopy would help. After several
> days of consideration, she has elected to have the laparoscopy.

AR 0516.

---

[2] The lumbosacral plexes are various nerve root bundles which exit the lower spine and feed into the
buttocks, thighs, and some abdominal organs. Scar tissue from female reproductive disorders can affect these
nerves, causing neurologic symptoms similar to what would be found with degenerative spinal diseases, but
without any such degeneration being visible on spinal imaging. *See* Ana C. Siquara de Sousa, et al., Magnetic
resonance imaging evidence for perineural spread of endometriosis to the lumbosacral plexus: report of 2
cases, 39 Neurosurg. Focus (3):E15 (2015), available at https://pubmed.ncbi.nlm.nih.gov/26323816/

PLAINTIFF'S MOTION FOR JUDGMENT          7

Unfortunately, this surgery did not help. In July of 2015, approximately six weeks after the laparoscopy, Ms. Stephens visited Dr. Erik Shaw, having been referred there by Dr. Donadio for a second opinion as to the nature and treatment of her pain. Dr. Shaw assessed Ms. Stephens as having "Probable lumbosacral plexus entrapment with scarring." AR 0474. He discussed with Ms. Stephens that, in his opinion, "I don't think there is any Magic bullet" for her pain. *Id.* Dr. Shaw was of the opinion that Ms. Stephens should try a spinal cord stimulator, certain spinal injections, and a different type of narcotic pain medication. *Id.* Ultimately, Ms. Stephens did not follow all of these recommendations, but did continue receiving care from Dr. Donadio.

By September of 2015, Dr. Donadio noted on a Standard questionnaire that his patient had "regressed." AR 0550. He stated that Ms. Stephens would be "unable to work regardless of work modifications," and stated in his remarks section that his patient "is totally and permanently disabled." *Id.*

Ms. Stephens's condition did not improve after this point. Due to ongoing complaints of left leg pain, and that she is "dragging her left leg" (AR 0441), Dr. Donadio ultimately prescribed a wheelchair for use when she leaves home (AR 0117) and a wheeled walker for use at home (AR 0118). In November of 2016, Dr. Donadio completed another form at Standard's request, stating that Ms. Stephens suffered from abdominal, back, and leg pain. AR 0119-21. He states that his patient "is in bed most of day" due to chronic pain. The form asked when the doctor believes the patient would be able to return to work - Dr. Donadio replied "Never." The form also asked whether Dr. Donadio would "corroborate your patient's complaints," to which he replied "Yes." The form asked whether there were any

indications of malingering or symptom exaggeration, none of which were endorsed by Dr. Donadio.[3] AR 0121.

The latest available medical record in the claim file shows that Ms. Stephens's condition worsened even more thereafter. On October 2, 2017, Dr. Donadio's records show that she was then prescribed not only Hydrocodone, but also extended-release Morphine ("MS Contin 15 mg qd," or four times per day). AR 0115. This is in addition to several other medications with powerful side effects, such as Clonazepam, Topamax, Promethazine, and Robaxin. *Id.* Each of these medications lists drowsiness as one of its most common side effects.[4] The same record discusses plans to pursue other treatments in the future, subject to Ms. Stephens's ability to afford them. *Id.*

Ms. Stephens's appeal letter, after Standard denied her claim, includes her own description of how she was feeling toward the end of the time covered in the claim file:

> Unfortunately as my situation [h]as progressed and my symptoms have worsened, I now require the assistance of a walker or a wheelchair most days. I absolutely do walk with a limp. I am now having muscle spasms in my left pelvic, lower extremity that affect my left leg....
>
> [L]ife now consists of my being in bed 95% or more on an average day. If I do make it outside of my home and if we must travel any distance, I can only do so by making a bed for me to lay down in a van. If I do manage to go somewhere for any time, it generally takes days for me to recover. Church was very important to my family and a major part of our lives... I can probably count on one hand how many times I've been able to attend in the past year and even then I was unable to sit through an entire service....

---

[3] The form does not ask the doctor to check "yes or no" for the malingering questions, it only provides a blank line next to each question.

[4] *See* Medline Plus, the U.S. National Library of Medicine's website, at the following individual pages: https://medlineplus.gov/druginfo/meds/a682279.html (Clonazepam), https://medlineplus.gov/druginfo/meds/a697012.html (Topiramate ("Topamax")), https://medlineplus.gov/druginfo/meds/a682284.html (Promethazine), https://medlineplus.gov/druginfo/meds/a682579.html (Methocarbamol ("Robaxin")), each accessed on Dec. 1, 2020.

Dr. Eric Shaw looked at me, while very professional, but as gently as I guess he could, simply said "Mrs. Stephens, you simply have to get use [sic] to a new way of life." As I told Dr. Donadio at a recent appointment, unfortunately my symptoms are getting worse, not even to a point of "this is it."...

In summary, unfortunately I am in near constant pain. Sitting in a "desk" sitting position for any length of time is impossible. This causes the pain in my back that radiates down my leg to the level of being unable to walk and increases the muscle spasms. Standing for any length of time causes the stomach and pelvic pain and the muscle spasms are getting worse from the vaginal and pelvic area into the back and down the left leg. Overall, the muscle spasms are worsening daily.

AR 0106-108.

### B.    Claim History

At different points in this claim, Standard had Ms. Stephens's medical records reviewed by four different in-house consulting doctors. First, prior to approving the LTD claim, was Dr. Oded Shulsinger. AR 0383-85. In his report dated December 16, 2015, Dr. Shulsinger reported that Ms. Stephens was "unable to do her light level occupation due to her chronic pain syndrome." AR 0385. He stated that the etiology of the pain was "somewhat unclear... but there is documentation that the claimant is having significant pain which so far has not responded well to treatment, and is on multiple medications." *Id.* Dr. Shulsinger projected that if nothing changed "she may need further evaluation by either an FCE or an IME...." *Id.* Based on this opinion, Standard approved Ms. Stephens's claim for LTD benefits. AR 0593.

In August of 2016, Standard had the file reviewed by another of its in-house consulting physicians, this time by Dr. Edward Wolff. AR 0260-62. Dr. Wolff wrote that the "chronicity of this claimant's pain bodes poorly for eventual permanent relief," but noted that several treatment options had not yet been pursued. He opined that Ms. Stephens's

ability to work "through her pain from December 2013 [] shows motivation to continue her

work...." AR 0261. Based on her ability to work at her own "light" occupation until June of

2015, he opined that Ms. Stephens was capable of no more than sedentary work at the time

of his review. *Id.* Like Dr. Shulsinger before him, Dr. Wolff suggested that an FCE may be

necessary to evaluate the claim in the future. *Id.*

Dr. Wolff was later asked to "clarify" his opinion. AR 0221-22. Specifically, he was

asked why he determined Ms. Stephens was limited to sedentary work. He responded as

follows:

> The reasoning is that this claimant had been working with some degree of
> pain prior to her incur date, and that she worked through light capacity
> through her pain from December 2013 to June 2015. The claimant's
> motivation is credible and it is documented that she worked through her pain
> as indicated in the previous sentence. **Without this motivation, limitations
> and restrictions might have been considered to be less than sedentary.**
> Therefore, sedentary work has been opined.

AR 0221 (emphasis added). Dr. Wolff also added notes related to a phone call he had with

treating pain management physician Dr. Donadio:

> It should be stated here that a telephone call with Dr. Richard Donadio was
> completed with regard to the claimant's current status. Dr. Donadio has
> stated that he knows the claimant for many years and that she spends most
> of her time in bed. He states further that the claimant is highly motivated and
> wants to work and would work if she could. He feels that the claimant does
> not even has [sic] sedentary capacity.
>
> It is, therefore my opinion that this claimant has **no sustainable functional
> capacity from the incur date of June 03, 2015 to the current time** and
> that this case should be reviewed within 6 to 12 months regarding the
> claimant's functional abilities or disabilities.

AR 0221-22 (emphasis added). In summary, Dr. Wolff only said Ms. Stephens could do

sedentary work at all because she was "motivated" and worked with pain for as long as she

did. But after speaking with treating physician Dr. Donadio, he was convinced that she could

not perform any work at all.

Dr. Wolff's review saw the claim approved for the rest of the "own occupation"

period, through September 1, 2017. After that date, Ms. Stephens had to be found disabled

from "any occupation" to receive continued benefits. That question was put to another

consulting physician, Dr. Charles Glassman. AR 0126-28. Dr. Glassman did not speak to Ms.

Stephens or any of her doctors, but based on a review of the records provided to him, he

wrote the following:

> There is no medical documentation that would explain the claimant's
> inability to get out of bed except to go to the bathroom. Given that her
> **reported symptoms are so extreme, it is my opinion that the claimant
> may have some physical limitations** and restrictions, although not
> supported by medical documentation. Therefore, reasonable limitations and
> restrictions related to this condition would be that the claimant should not
> lift, carry, push, or pull greater than 10 pounds. **The claimant can sit
> constantly** as long as she has the ability to change positions and rest. The
> claimant can stand and walk occasionally as long as she has the ability to rest
> every 15 minutes....Because part of the claimant's symptom complex involves
> fatigue, the claimant should avoid driving while drowsy and avoid working on
> heavy machinery while drowsy. With these limitations and restrictions, the
> prognosis for the claimant is fair and the duration is likely permanent.

AR 0127-28 (emphasis added). In summary, Dr. Glassman claims he is able to determine

how much pain Ms. Stephens is experiencing - and that she can perform full-time work -

without examining her, without speaking to her, and without even speaking to any of her

doctors. Despite both Dr. Shulsinger and Dr. Wolff suggesting that an IME or FCE might be

helpful to evaluate this case, Standard relied instead on Dr. Glassman's file review to deny

the claim as of the policy's change in definition from "own occupation" to "any occupation."

AR 0564.

Following Ms. Stephens's self-appeal[5], Standard did not obtain an IME, nor an FCE, but instead sent the file for fourth paper review with another of its in-house physicians. AR 0090-93. Despite the claimant's condition only worsening over time, as described in the medical history above, Dr. John Hart opined fewer restrictions than any of the previous consultants. He stated that Ms. Stephens could lift up to fifteen pounds, and that "she is capable of standing or walking at a frequent[6] level." AR 0092. He added that she could perform these and other activities "at a full time basis." *Id.* When asked whether he found Ms. Stephens's "reported symptoms consistent with the medical evidence in the claim file?" Dr. Hart responded:

> No. Her complaints are not consistent. The pain management physician did not find any significant abnormalities. The neurologist's examinations were normal. It is noted that she has had the suspected diagnosis of fibromyalgia. The medical records do not document a clinical examination that would be fully consistent with fibromyalgia. They reported that she was suspected having [sic] fibromyalgia.

AR 0092. To summarize, while there are several contributing causes for Ms. Stephens's pain, some of which are confirmed and some merely suspected, Dr. Hart finds no support in this record for pain that would interfere with work in any meaningful way. Despite prescriptions for a wheelchair and a walker, and complaints of dragging her left leg, Dr. Hart believes she can walk for more than five hours per day. And he comes to this conclusion, as Dr. Glassman did, without the benefit of an in-person exam, or even a phone call with the claimant or any of her doctors.

---

[5] Ms. Stephens was not represented by counsel at any time prior to Standard's final denial of her claim.

[6] While he does not specifically so state, presumably Dr. Hart is referring here to the Dictionary of Occupational Titles definition of "frequently," meaning up to 2/3 of the day.

Dr. Hart's file review resulted in the denial of Ms. Stephens's appeal, marking the end of her administrative remedies. The final denial letter itself relies largely on Dr. Hart's opinion. AR 0710-12.[7]

## II.    LAW & ARGUMENT

## A.    Standard of Review

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court held that "[a] denial of benefits governed by ERISA is given *de novo* review unless the plan documents - in unambiguous terms – grant discretion to the plan administrator or fiduciary to determine eligibility for benefits or to interpret the terms of the plan." In this case, the parties agree that the policy does contain such discretion-granting language. Abuse of discretion, or "arbitrary and capricious" review of Standard's decisions and behavior is therefore warranted.

Even under an abuse of discretion review, an administrator's decision will be overturned if it is not "reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010). The reasonableness standard will overturn an administrator's denial if it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts on the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (internal quotation marks omitted). Further, when "the insurer acts as both funding source and administrator[,]" there is a structural conflict of interest that "must be weighed as a

---

[7]The denial letter "acknowledge[s]" that Ms. Stephens had been approved for Social Security disability by this time. AR 0712. In fact she had not been so approved. There was some confusion over paperwork when Standard referred Ms. Stephens to Social Security firm Allsup, and a claim for Social Security benefits was never opened. AR 0721. In her appeal letter, Ms. Stephens explained her understanding that Standard had only referred her to Allsup in the first place because Standard itself deemed her to be "a permanent disability case." AR 0106. Standard's appeals representative misinterpreted this as a statement that Ms. Stephens had been found disabled by Social Security. AR 0104.

factor in determining whether there is an abuse of discretion." *Salomaa*, 642 F.3d at 674 (internal quotation marks omitted). Such structural conflicts will weigh more or less heavily as a factor in the abuse of discretion calculus. *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 563 F. App'x 530, 530-31 (9th Cir. 2014) (citing *Firestone*, 489 U.S. at 115); *see also Abatie*, 458 F.3d at 967 ("We read *Firestone* to require abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record.").

This Court explained the Ninth Circuit's guidance in weighing financial conflicts as follows:

> In *Montour v. Hartford Life & Acc. Ins. Co,* the Ninth Circuit provided guidance for applying the abuse of discretion standard when there is a structural conflict of interest. 588 F.3d 623, 629–30 (9th Cir. 2009). A determination of whether a plan administrator abused its discretion turns on a consideration of "numerous case-specific factors." *Id.* at 630. The reviewing court must consider, as one of those factors, the existence of a conflict of interest and should assign weight to the conflict of interest based on the apparent degree to which the conflict improperly influenced the administrator's decision. *Id.* Other factors that "frequently arise" in ERISA cases include: (1) the quality and quantity of medical evidence; (2) whether the plan administrator subjected the claimant to an in-person medical evaluation or merely relied on a paper review of the claimant's existing medical records; (3) whether the administrator provided its independent experts with all of the relevant evidence; and (4) as applicable, whether the administrator considered a contrary Social Security Administration ("SSA") disability determination. *Id.* at 630. Courts are directed to "reach a decision as to whether discretion has been abused by weighing and balancing [the] factors." *Id.*

*Robertson v. Standard Ins. Co.*, 139 F. Supp. 3d 1190, 1200–01 (D. Or. 2015).

///

///

### 1.    Standard's financial conflict affected Ms. Stephens's claim

Standard is operating under a conflict of interest. It is both the funding source for Ms. Stephens's disability benefits and the administrator deciding whether to approve her claims (continue her benefits). In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), the Supreme Court held that where "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket . . . this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Id.* at 108. Pursuant to *Glenn*'s instruction, this inherent conflict of interest must be "weighed as a factor" when reviewing the insurer's denial decision.

Subsequent to *Glenn*, the Ninth Circuit revisited the effect of an insurer's financial conflict of interest in *Salomaa v. Honda Long Term Disability Plan*, 637 F.3d 958 (9th Cir. 2011)("We know that we are supposed to 'weigh' a conflict of interest in deciding how skeptical to be of the administrator's decision, according varying weight to it depending on other factors, but that is a hard standard to apply.") In the ERISA context, *Salomaa* expressly recognized the allure for an insurance company to put its own financial interests ahead of those of its insured participants.

> An insurance company that approaches claims-handling unfairly in an ERISA plan may have an **incentive to be more unfair** than, say, a life insurer or auto-liability insurer, because it cannot be subjected to the punitive damages for bad faith that are the bogeymen of insurance companies in those fields.

*Id.* at 967 (emph. added); *see also, Hangarter v. Provident Life & Accident Ins. Co.*, 373

F.3d 998, 1011 (9th Cir. 2004) (recognizing that ERISA limits the remedies otherwise available to an insured where an insurer improperly denies a claim; "the termination letter incorrectly stated that the policy was governed by ERISA. If true, this would have meant that Hangarter had no available remedies under state law, including punitive damages.").

Despite its recognition of the insurer's inherent financial conflict and corresponding temptation, *Salomaa* acknowledged that the administrative record usually does not contain the information necessary for a court to determine the degree to which the financial bias impacted a claim.

> Usually the record does not disclose an insurance company's claims handling history in other cases or its internal directives to claims managers about how to evaluate claims. Thus we are ordinarily ignorant of much of what we are supposed to 'weigh.' For all we know, the claims administrator evaluating Salomaa's claim would be voted for promotion based on the percentage of claims rejected, or had formed a personal opinion (or her boss had) that all chronic fatigue syndrome claims were fraudulent.

*Salomaa*, 637 F.3d at 967. In this case, there are multiple indications that Standard placed its financial interests ahead of Ms. Stephens's, discussed below. This was improper not just as a matter of case law as quoted above, but as a matter of the ERISA statute itself. *See* 29 U.S.C. §1104(a)(1) (requiring an ERISA fiduciary to administer a plan "solely in the interest of the participants and beneficiaries"). Despite the Supreme Court's admonition in *Glenn* that an ERISA insurer should "wall off claim administrators from those interested in firm finances", the record shows Standard has not done so. *Glenn*, 554 US. at 117. To the contrary, Standard's claims personnel and doctors are intimately aware of and participate in the financial impact of claim decisions.

Instead of "walling off" claim administrators from financial concerns, Standard's claim file prominently displays the reserves[8] Standard had set aside for her claim, and in general on how much the claim was costing. *See, e.g.,* AR 1030, 1039, 1045, 1054, 1060, 1069. Form worksheets even ask the claims personnel to calculate reserves manually, based on the monthly benefit and the amount of time remaining on the claim. AR 0593. At one point in the claim, Ms. Stephens's claim was discussed via email as one of three "**big hitters**," or expensive claims requiring further review. AR 0763 (emph. added). As part of that review, the claims handler was asked several questions apparently designed to determine how long Standard would have to continue paying Ms. Stephens. "How serious is the diagnosis? Do you think the member will ever go back to work? If so when? Will there be an SS offset?[9] Have they had any improvements in their condition since last year?" *Id.* In response, the claims handler assigned to Ms. Stephens's case responded that her claim was being medically reviewed, because "It is unclear whether ongoing limitations and restrictions continue to be supported." *Id.*

There is also evidence that everyone at Standard is encouraged to focus on the general financial performance of the company, including not only claims handlers but consulting doctors. *See* Exhibit A, "Deposition of Dr. John Hart." This exhibit is a deposition given by Dr. Hart in a previous Standard Insurance Company disability insurance case. He states that as a consulting doctor for Standard, he received weekly emails discussing the

---

[8] Reserves are funds an insurer must set aside to pay claims. Upon denial of a claim, the reserves are released, thereby generating a paper profit for the insurer. *See generally, Merrick v. Paul Revere Life Ins. Co.,* 594 F. Supp. 2d 1168 (D. Nev. 2008) (discussing impact of reserves on disability insurer's profitability).

[9] Referring to an offset of Social Security Disability benefits, which would allow Standard to pay less in LTD benefits each month, and would reduce future reserves dramatically.

financial performance of the company. Ex. A, p. 3.[10] Dr. Hart testified that these emails come from Standard's management, and are sent to "thousands" of Standard's employees. *Id.* at 3-4.

Having denied Ms. Stephens's claim, the claims personnel were able to release all reserves for the claim, which Standard's internal notes show to be $213,353.55 as of shortly before the claim was denied. AR 1090. This directly impacted Standard's profits, which Dr. Hart's testimony shows was of interest to nearly everyone working at Standard. *See e.g. Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168 (D. Nev. 2008). This evidence demonstrates at the very least that Standard's focus was on its financial results, more so than the accuracy of its claim decision. *Glenn*, 554 U.S. at 117 (recognizing the obligation for an ERISA administrator to take "active steps to reduce potential bias and to promote accuracy").

## 2. Standard's sole reliance on medical record reviews raises questions of accuracy and thoroughness

In addition to Standard's focus on claim reserves, additional facts warrant the Court concluding Standard put its interests ahead of Ms. Stephens's. When reviewing this claim, despite the insurance policy language permitting it to have her actually examined by a qualified physician, Standard elected to rely solely on record reviews. While a plan administrator is not required to examine the claimant, *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008), the lack of a physical examination is an additional factor the Court should consider when determining if the denial decision was reasonable.

---

[10] Deposition page 12, lines 10-13, stating that an executive "above the department that I'm in" sends out emails stating "that they've done well with their other quarter... where the insurance is and where the company is."

*See Salomaa*, 642 F.3d at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits. The skepticism we are required to apply because of the plan's conflict of interests requires us to consider this possibility in this case."); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009) ("Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records."); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) ("We find that the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."); *Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112, 1122 (D. Or. 2013).

> [W]e may consider whether a consultant engaged by a plan may have an incentive to make a finding of not disabled as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician.

*Judd v. Qwest Communs. Int'l*, 2012 WL 3704703, *3 (D. Ariz., Aug. 28, 2012).

> However, the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Constantino v. Aetna Life Ins. Co.*, 2014 WL 5023222, *7 (C.D. Cal., Oct. 8, 2014) (citing *Calvert*, 409 F.3d at 295).

The concerns expressed by the Ninth Circuit, and reiterated in the district courts, concerning the impartiality of paid record reviews is well founded. Again, in reviewing Ms.

Stephens's claim, Standard did not accept the opinions of her treating physicians. But, rather than have her physically examined (thereby risking an opinion supporting disability, *Salomaa*, 642 F.3d at 676), Standard elected to rely solely on record reviews from its own physician contractors. *See* AR 0090-93, 126-28, 221-22, 260-62, 383-85, 466-67, and 477-80. While these doctors each state that they are independent contractors, paid by the hour to review files, it is reasonable that they would feel pressure to offer opinions which would support denials, both to preserve their own consulting arrangements and as part of Standard's "team," all of which (including "independent" doctors) are encouraged to focus on the company's overall financial performance.

**3.    Standard's reliance on Dr. John Hart to support its final denial was flawed**

The fact that Standard relied on Dr. Hart's opinion for its final denial of this claim raises additional concerns. Dr. Hart has been criticized in the past for offering conclusory opinions that chronic pain patients can perform sedentary work, despite their pain complaints. "Dr. Hart did not explain why he believed that Plaintiff was not disabled, he just stated in a conclusory manner that she had no limitations or restrictions." *Robertson v. Standard Ins. Co.*, 139 F. Supp. 3d 1190 (D. Or. 2015). *See also Armani v. Northwestern Mutual Life Ins. Co.*, 840 F.3d 1159 (9th Cir. 2016) (reversing decision to deny chronic pain claim based on Dr. Hart's non-examining opinion that the claimant could perform sedentary work).

In fact, Dr. Hart's deposition testimony reveals that it would be quite difficult to ever convince him that a chronic pain patient was incapable of sedentary work. Dr. Hart is not

board certified in pain management, and states that he has no intention of ever attaining that certification. Ex. A, p. 2 (2014 deposition testimony stating he is not board certified in pain management and "will not be doing it in the future either."; AR 0096 (Dr. Hart's current CV, showing no board certification in pain management). This comes as no surprise, as Dr. Hart's deposition testimony reveals that he essentially does not believe pain can be disabling, except in the most extreme circumstances.

Dr. Hart believes that most people with chronic pain can perform sedentary work. Ex. A, p. 21.[11]  When asked whether it would ever be possible for a chronic pain patient to be incapable of sedentary work, he answered that it would only be possible "in the acute setting," such as a recent surgery, or when progressive cancer is the cause of the pain. *Id.* When specifically asked whether a patient with chronic back pain could ever be disabled from sedentary work, he admitted it would be possible, but gave the example of a patient whose spine had been "fused from T2 -- that's right up here below your neck -- all the way down to the sacro..." *Id.*[12] Even then, Dr. Hart stated that it would not be the patient's pain that prevented sedentary work, but the mechanical functioning of his body. *Id.*

This is a common theme. Throughout his deposition, Dr. Hart shows that he gives little to no credence to claimants' complaints of chronic pain, instead focusing almost exclusively on mechanical functioning. When asked what he looks for in a medical record to evaluate allegations of inability to sit or stand for long periods of time, Dr. Hart stated that he looks to see "is there something in there [the medical records] that sitting and standing would be knocked out? Is there something in there that would make me stop and say, yeah,

---

[11] Deposition page 83, lines 3-25.
[12] Deposition page 84, lines 13-20.

PLAINTIFF'S MOTION FOR JUDGMENT            22

he does have a problem with his left hip joint, he can't stand, or something like this." Ex. A.,

p. 23.[13] When asked about a specific medical record stating a patient would need to lie

down for 20 minutes every 2 hours due to back pain, Dr. Hart said that to him, this would

*not* serve as documentation of an inability to sit or stand:

> Q[uestion:]    So that [medical record] isn't documentation of an ability to sit and stand?
>
> A[nswer:]    No, it's not. Here is the reason why. What that is is what the patient ... reports to his doctor. In some individuals, that would be that, to use the wording, require such severity to require supine laying down 20 minutes every two hours. There are cases where that would be understandable, like right after surgery. That would be very typical. But for chronic that would be so highly unusual, **I've never heard and seen it** and certainly not with this condition.

Ex. A., p. 23 (emphasis added).[14]

Based on this testimony, there is essentially no way that a claimant such as Ms.

Stephens could be approved for "any occupation" benefits with Dr. Hart reviewing her

claim. He believes that, unless you have had a recent surgery or are dying of cancer, one can

essentially always perform sedentary work. A claimant such as Ms. Stephens, complaining

of chronic pain so severe and pervasive that she spends much of her day in bed, could never

convince Dr. Hart of her disability, despite the full-throated support of her treating doctors.

As such, Standard's decision to rely solely on file reviews in the case and to not send Ms.

Stephens for a physical exam is highly suspect, both as a general practice and specifically

with regard to Dr. Hart.

///

///

---

[13] Deposition page 90, line 15 through page 91, line 8.
[14] Deposition page 92, lines 5-15.

### B.    Relevant Plan Terms

This disability insurance policy was issued by Standard to Ms. Stephens's long-time

employer, the Harbin Clinic, LLC. AR 0010. As she was not a physician or officer of the

company, Ms. Stephens fell into "Class 3" as defined in the policy. AR 0013. Class 3

participants are eligible to receive "own occupation" disability benefits for up to 24 months

after the policy's 90-day elimination period (waiting period), but must prove disability

from "any occupation" thereafter. AR 0013-14. That definition of disability is as follows:

> Any Occupation Definition of Disability
>
> During the Any Occupation Period you are required to be Disabled from all occupations.
>
> You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.
>
> Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 80% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.
>
> Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

AR 0020. As Ms. Stephens did receive all of the "own occupation" benefits available to her

under the policy, and was denied benefits at the 24-month "any occupation" stage, the

above is the relevant definition of disability for this case.

///

**C.     Ms. Stephens Has Proven Her Continuing Disability**

The medical evidence supports Ms. Stephens's claim for continuing disability

benefits, beyond Standard's denial of the claim at the "any occupation" change in definition.

Ms. Stephens's own statements have at all times been consistent, and no evidence

contradicts them. She has the support of her treating pain management specialist, Dr.

Donadio, as well as consulting pain management specialist, Dr. Shaw. Even Dr. Wolff, the

only Standard file reviewer who spoke to one of Ms. Stephens doctors, agreed that Ms.

Stephens "has no sustainable functional capacity...." AR 0222. While the exact etiology of her

pain is not entirely clear, no one who has met her disputes its existence, and her

prescription regimen alone supports her claims. Since sitting is a particular problem for Ms.

Stephens, it is highly unlikely she could perform a full-time sedentary occupation, as

Standard claimed in its denials.

**1.     The severity of Ms. Stephens's condition is supported by the**
**evidence of her treatment**

Standard's final denial letter states that Ms. Stephens's treatment has been

"conservative" and has not "significantly changed despite continued reports of pain." AR

0711. The letter also states that if Ms. Stephens's condition was as bad as she claimed,

Standard would expect to see "referral to a home health program, rehabilitation

center/services, and or physical therapy." Both of these conclusions are flawed. Ms.

Stephens has had two surgeries, multiple injections, and was prescribed Morphine for

chronic pain. All of this is objective medical evidence supporting her complaints of pain.

Courts have long drawn inferences about the seriousness of pain complaints based on the responses of medical professionals to those complaints, including prescription medications. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640 (7th Cir. 2007). It is an "improbability that [plaintiff] is a good enough actress to fool" her doctors into thinking she suffers extreme pain. *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004). *See also Montour*, 588 F.3d at 635 (relying on medical and pharmacy records as relevant "objective" evidence to use when assessing the severity of a claimant's reported pain); *Flanigan v. Liberty Life Assur. Co. of Boston*, 277 F. Supp. 2d 840, 844 (S.D. Ohio 2003)("The fact that Plaintiff is on so many strong medications is objective evidence that she is indeed chronically disabled").

Furthermore, the use of prescription pain medications such as Morphine and Hydrocodone cannot properly be characterized as routine or conservative. *See, e.g., Diaz*, 499 F.3d at 646 (describing Vicodin as a "strong" pain medication); *Proctor v. Astrue*, 665 F. Supp. 2d 1243, 1256 (D. Colo. 2009) (describing Vicodin as a "very strong pain medication"); *Abbott v. Astrue*, 391 F. Appx. 554, 560 (7th Cir. 2010)(characterizing Hydrocodone as a "strong pain reliever[]"). "[M]ultiple narcotic pain medications, to include oxycodone and morphine, prescribed over the course of several years, is not 'conservative' treatment." *Judi W. v. Saul*, 2019 WL 3237513, *9 (D. Or. July 18, 2019) (citing *Bucknell v. Berryhill*, 2018 WL 6198459, *4 (C.D. Cal. Nov. 27, 2018)).

The descriptions in the record of Ms. Stephens's initial hysterectomy in 2013 support her doctor's opinions that her pain is likely abdominal in origin. She was told that her uterine lining had "ripped" and that fibroids had grown towards her intestines. AR 0362. After a year and a half of working with pain, she underwent a second surgery, in

hopes that removing some of the post-hysterectomy scar tissue would alleviate her pain. AR 0516. Since that time, she has had multiple injections at various sites. AR 0427 (lidocaine injection for "spinal enthesopathy," along with two "trigger point" injections of Depo-Medrol); AR 0162 (Dexamathasone (steroid) injection). While physical therapy notes are not in the file, there is evidence that Ms. Stephens tried physical therapy, unsuccessfully. AR 0473 ("Physical therapy is made dramatically worse recently.") All of this, of course, is in addition to the multiple strong prescriptions she has been prescribed throughout the record. Quite contrary to Standard's denial letter, Ms. Stephens's treatment has not been conservative, and should adequately support her complaints of debilitating pain.

### 2.    Ms. Stephens could not sit enough to perform sedentary work

If a person cannot sit for extended periods of time, they cannot perform sedentary work. Sedentary work, by definition, "involves sitting most of the time." *Brigham v. Sun Life of Canada*, 317 F.3d 72, 78 (1st Cir. 2003) (setting forth the definition of sedentary work in the Dictionary of Occupational Titles). Even if a person can sit for a full four hours per day, this is not enough to be able to perform full-time sedentary work. *See Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 n. 5 (2nd Cir. 2001) ("ability to sit for a total of four hours does not generally satisfy the standard for sedentary work."); accord, *Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x. 544, 548–49 (6th Cir. 2006) (plaintiff's inability to sit for more than four hours during an eight-hour day rendered her incapable of performing sedentary work.); *Alfano v. CIGNA Life Ins. Co. of New York*, 2009 WL 222351, at *18 (S.D.N.Y. Jan. 30, 2009) (sitting tolerance of "6 hours per day [is] generally recognized as the minimum tolerance required for sedentary work" under the DOL's definition.)

PLAINTIFF'S MOTION FOR JUDGMENT          27

Ms. Stephens cannot sit through a church service, much less can she sit for a full six hours per day. She has given multiple statements to that effect, including her initial LTD phone interview (AR 0755), and her appeal letter (AR 0108). Her medical records show the same. AR 0242 ("trouble sitting for long periods"), AR 0362 ("pain seems worse after sitting"), AR 0473 ("sitting upright for long periods of time seems to make it worse.") Her treating physician, Dr. Donadio, endorsed that she could sit "occasionally," which on Standard's form was defined as "1%-33%" of the time. AR 0120. It is not clear where Dr. Donadio believes Ms. Stephens's abilities would fall on that spectrum, from 5 minutes to 2.6 hours, but in any event he certainly did not feel she could sit for 6 hours per day. Because the evidence is clear that Ms. Stephens could not sit long enough to perform a full-time sedentary occupation, Standard's decisions to the contrary were an abuse of discretion. "[A]n employee who cannot sit for more than four hours in an eight-hour workday cannot perform 'sedentary' work that requires 'sitting most of the time.' " *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016).

For the foregoing reasons, Plaintiff has met her burden of showing continued disability under the terms of the LTD policy. Given her inability to sit, her extreme levels of pain, and the amount of time she spends in bed, there is no way she could perform any occupation on a regular basis.

## D.    Standard Improperly Terminated Ms. Stephens's Disability Benefits

Standard's denials of this claim were arbitrary and capricious. Rather than obtaining an in-person exam, Standard chose to rely on file reviews, which are poorly suited to this type of condition. Standard didn't even get file reviews from board-certified pain

management physicians, instead relying on physical medicine doctors, one of whom it knew would never approve a claim such as Ms. Stephens's. All of these facts together show that Standard's denials were an abuse of discretion.

> 1.    **Standard abused its discretion in denying this claim without an in-person examination**

It is not always an abuse of discretion to deny a disability claim without an in-person exam, but when the condition does not lend itself to "paper review," and when all of the doctors who have examined the claimant agree on disability, it often is, as it is here. This is particularly true when the insurer's own file reviewers suggest the need for an in-person exam, and the insurer does not do so.

A plan administrator is not required to obtain an exam in every case. *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008) ("ERISA also does not require that an insurer seek independent medical examinations."). "Nevertheless, one factor that courts consider when determining if a plan administrator abused its discretion, particularly in cases where the administrator has a conflict of interest, is whether the plan administrator conducted only a paper review of the claimant's file." *Robertson v. Standard Ins. Co.*, 139 F. Supp. 3d 1190, 1204 (D. Or. 2015) (citing *Salomaa*, 642 F.3d at 676).

> In *Salomaa*, the claimant's treating physicians opined he was disabled. The plan administrator conducted only a paper review and did not have the claimant examined. 642 F.3d at 676 ("The only documents with an 'M.D.' on the signature line concluding that he was not disabled were by the physicians the insurance company paid to review his file. They never saw [the claimant]."). The Ninth Circuit held the plan administrator abused its discretion when it denied the claim in part as the result of failing to have the claimant examined. Id. at 676, 680–81.

*Robertson*, 139 F. Supp. 3d at 1204.

Certain conditions are simply not amenable to meaningful paper file review. When disabling symptoms are alleged based on those conditions, and supported by examining doctors, it is error to reject them based on a paper file review alone. *See Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112, 1123 (D. Or. 2013) (describing a cognitive impairment corroborated by treating physicians as a situation in which "a plan administrator *should* conduct an IME" (emphasis original) and that such exam was "legally required under the circumstances.") In the absence of some record evidence suggesting the claimant is exaggerating her complaints, a paper file review is not sufficient to reject them. *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008) ("we will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is reason to doubt the applicant's credibility.")

Ms. Stephens has just such a condition, and it was error for Standard to rely on paper file reviews alone. Ms. Stephens has had multiple abdominal surgeries, and her treating doctor's working theory is that the scar tissue from these surgeries is causing the pain not only in her abdomen, but in the nerves exiting her lower spine. Dr. Donadio, Dr. Shaw, and even Dr. Wolff (the only Standard reviewer who spoke to anyone who had examined Ms. Stephens) all believed that her pain was serious and genuine. To even send this claim for a file review was a poor decision on Standard's part. Relying on such file reviews to deny the claim, when none of the paper reviews revealed any reason to question Ms. Stephens's credibility or the genuineness of her complaints, was an abuse of discretion.

The failure to obtain an in-person examination is even more likely to be an abuse of discretion when the administrator's own doctors suggest it, and the administrator still

ignores the need for an exam. An insurer's failure to follow advice from its own staff or consultants is exactly the type of procedural irregularity that demonstrates that an insurer's financial bias has infected the claims decision. *Culley v. Liberty Life Assurance Co.*, 339 F. App'x 240, 244 (3d Cir. 2009). Courts have ruled that an ERISA administrator cannot ignore the recommendations of its own staff and consultants. *See Jani v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 209 F. App'x 305, 311-12 (4th Cir. 2006); *Ferguson v. Hartford Life & Accident Ins. Co.*, 268 F. Supp. 2d 463, 471-72 (E.D. Pa. 2003) (overturning denial where file reviewer twice recommended exam, and no exam was conducted); *Lin v. Metro. Life Ins. Co.*, 2016 WL 4373859, *9 (N.D. Cal. Aug. 16, 2016) (fact that insurer failed to conduct exam "in contravention to the recommendation of its own consultant—further underscores the result-driven nature of MetLife's decision to terminate Plaintiff's benefits.")

Both Dr. Shulsinger, Standard's first file reviewer, and Dr. Wolff, its second file reviewer, stated that an in-person exam may be needed to fully evaluate Ms. Stephens's condition. AR 0261, 0385. Yet there is no evidence that Standard even considered doing this. It is reasonable to conclude that Standard's financial conflict of interest affected the decision not to obtain an in-person exam, either based on the cost of the exam or the fear that such an exam would support the claim, and Standard would be unable to deny further benefits. *Salomaa*, 642 F.3d at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits. The skepticism we are required to apply

because of the plan's conflict of interests requires us to consider this possibility in this case.")

Regardless of whether it was improper motive or simply shoddy claims-handling that led to Standard's decision not to obtain an exam in this case, it was an abuse of discretion to do so. Ms. Stephens's condition was not amenable to dismissal based solely on paper reviews.

### 2.    Standard abused its discretion in relying on Dr. Hart

Dr. Hart's review formed the basis for Standard's final denial, and it was error for Standard to rely on him. Not only is his opinion unfounded, and contradicted by the medical evidence, his prior deposition demonstrates that he would practically never find a chronic pain patient incapable of sedentary work.

To begin with, Dr. Hart stated that in May 2015, Dr. Donadio's records state the "etiology of pain is unknown." AR 0090. That is not what Dr. Donadio said. His May 2015 note actually said that he believes Ms. Stephens's pain is "intrapelvic for the most part and possibly to a lesser extent and less likely the spine." "Likely scar tissue and adhesions affecting the lumbosacral plexes." AR 0422. As Dr. Hart continues his review, he notes several times where neurologic exams were normal, but also notes that her pain complaints do not change. Dr. Hart found places noting Ms. Stephens to have a "normal gait" and to be "ambulating normally," and indeed those notes exist in the file, but he does not mention the other notes which state that she "does have issues at times" with walking (AR 0140), and listing walking as one of the Activities of Daily Living with which she has problems (AR 0141). Dr. Hart also mentions Ms. Stephens's wheelchair and walker prescriptions in his

"opening synopsis," and then never mentions it again, not even when he concludes that Ms. Stephens could stand and walk "frequently," or for more than five hours per day. AR 0090, 92). Most importantly, Dr. Hart makes no allowance whatsoever for the impact of pain on Ms. Stephens and her ability to work.

As shown in his deposition testimony described above, this is one of Dr. Hart's hallmarks. He does not believe that pain alone can ever be disabling, save for the most extreme cases. This may be his prerogative as a doctor, to have such an opinion. Standard, however, an an ERISA disability claims administrator, has a duty to consider the effects of pain on a claimant's ability to work. "The subjective element of pain is an important factor to be considered in determining disability." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127 (2d Cir. 2001). Pain must be considered as it would affect a person's ability to work. *Honda v. Sunshine Biscuit Long Term Dis. Plan*, 125 F.3d 858 (9th Cir. 1997) (unpublished, table case). Complaints of pain must be seriously considered, even where not fully supported by medical evidence. *Brown v. Continental Casualty Co.*, 243 F. Supp. 2d 321 (E.D. Pa. 2003) (citing *Chrupcala v. Heckler*, 829 F. 2d 1269, 1276 n. 10 (3d Cir. 1987)).

There is a growing trend in disability claims of certain doctors deciding that certain conditions are, essentially, never disabling. Fibromyalgia is the most common such condition, but many subjective pain and fatigue conditions are implicated. *See, e.g, Medefesser v. MetLife*, 2019 WL 6481794, *11 (D. Or. Sep. 5, 2019) (doctor "declined to make restrictions for Plaintiff's fibromyalgia and fatigue because there are no objective grounds to make restrictions and it is not a disease that can be measure objectively."); *Yancy v. United of Omaha Life Ins. Co.*, 2015 WL 9311729, *18 (C.D. Cal. Dec. 18, 2015) (reviewing

an extra-record statement made by a file reviewer, court found it "troubling that Dr. Knapp

was apparently of the belief that disability benefits are actually *harmful* to patients

suffering from fibromyalgia." (emph. original)); *Kaviani v. Reliance Standard Life Ins. Co.*, 799

F. App'x 753, 756 (11th Cir. Jan 31, 2020) (overturning denial based on doctors who stated

that "pain cannot be the basis of [claimant's] disability because he will be in pain whether

he is working or not...."). Such doctors cannot reasonably be relied on by ERISA

administrators, as they have a duty to not prejudge a claim based on the claimant's

diagnosis, but instead to consider the actual evidence of disability.

Dr. Hart is not an open-minded judge of pain complaints, at least when it comes to a

disability claim. He admits in his deposition that certain conditions can cause pain, but

states that he would only ever find someone incapable of sedentary work due to pain "in

the acute setting," the only examples of which came to his mind being cancer or after a

recent surgery. Ex. A at 21, Depo. pg. 83-84. Several times throughout his deposition, he

gives examples that reveal he largely rejects pain as a factor in considering functionality,

and instead looks solely to range of motion and the like. "[I]f they're missing a leg ... how

does that affect that person's function.... that's the end of what we do." Ex. A at 8, Depo. pg.

29. Inability to perform a sedentary occupation is "usually a function not so much of their

pain ... it's a function of what their medical problem is." Ex. A at 21, Depo. pg. 84. In Dr.

Hart's view, if someone can physically achieve a sitting position at all, they can probably

perform full-time sedentary work.

Standard erred twice in relying on Dr. Hart, specifically, for its final denial. First, his

review is contradicted by the evidence of record, and he provides no basis for rejecting her

subjective complaints. Second, he has demonstrated that he has no intention of seriously

considering the possibility that pain can be disabling in this, or any other case. As such,

Standard's reliance on him was an abuse of discretion, and the denial should be overturned.

### E.    Remedy Should Be Reinstatement of Benefits

The Court has the choice, when overturning this denial, of remanding the claim to

Standard for further consideration, or ordering benefits reinstated. Remand is appropriate

where the administrator has "'construe[d] a plan provision erroneously' and therefore has

'not yet had the opportunity of applying the [p]lan, properly construed, to [a claimant's]

application for benefits.'" *Canseco v. Constr. Laborers Pension Trust*, 93 F.3d 600, 609 (9th

Cir. 1996) (quoting *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability

Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996)). But in cases where the administrator has

abused its discretion when denying a claim for disability that was supported by the record,

courts have ordered payment of benefits on the ground that the administrator should not

be given a second chance. *See, e.g., Cooper v. Life Ins. Co. of N. Amer.*, 486 F.3d 157, 172 (6th

Cir. 2007) ("Plan administrators should not be given two bites at the proverbial apple

where the claimant is clearly entitled to disability benefits."). In *Fleet v. Independent Federal

Credit Union* the district court stated:

> If the procedure [remand] were to become routine, it would pose a serious
> risk of simply allowing 'Mulligans' to sloppy plan administrators—at the
> expense of both the courts and plan participants and beneficiaries .... "It
> would be a terribly unfair and inefficient use of judicial resources to continue
> remanding a case to [the plan administrator] to dig up new evidence until it
> found just the right support for its decision to deny an employee her
> benefits."

2005 WL 1183177, at *3 (S.D. Ind. May 18, 2005) (quoting *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 832 (7th Cir. 2004)).

In this case, the record contains ample evidence of Ms. Stephens's disability. The only reason she was ever denied is that Standard allowed its financial conflict of interest to influence its claims handling and decisionmaking. If any unbiased doctor had examined Ms. Stephens in person, they likely would have agreed with all of the other treating and examining doctors in the record who found Ms. Stephens's complaints to be genuine, and found her totally disabled. Instead, Standard relied on file reviewers alone, including one particular file reviewer that Standard knew had unreasonable biases against chronic pain patients. The Court should award all past-due benefits paid, and remand the claim to Standard only for future, reasonable management of Ms. Stephens ongoing claim.

III.     **CONCLUSION**

Ms. Stephens has proven on the face of this claim file that she is disabled by her pain. Her condition has only worsened over time, and Standard's entire decisionmaking process in denying the claim and appeal was arbitrary and capricious, and demonstrates the influence of its financial conflict of interest.

Respectfully submitted,

BY:      *s/Jeremy L. Bordelon*
         Jeremy L. Bordelon, OSB No. 160789

**CERTIFICATION OF COMPLIANCE WITH WORD-COUNT LIMIT**

In accordance with District of Oregon Local Rule 7-2(b), the undersigned certifies that the foregoing document contains 9,784 words, including headings, footnotes, and quotations, but not including the caption, table of contents, table of authorities, signature block, exhibit(s), and certificate(s) of counsel.

BY:     *s/Jeremy L. Bordelon*
         Jeremy L. Bordelon, OSB No. 160789

**CERTIFICATE OF SERVICE**

The undersigned certifies that on December 1, 2020, he filed the foregoing document with the Clerk of Court using the Court's ECF system. Notice of this filing will be delivered to counsel for all parties shown on the ECF system's Notice of Electronic Filing. The undersigned will mail a copy of the foregoing to any parties required to receive notice not shown on the NEF.

BY:     *s/Jeremy L. Bordelon*
         Jeremy L. Bordelon, OSB No. 160789

PLAINTIFF'S MOTION FOR JUDGMENT          37