# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NORMA JEAN STEPHENS**,<br><br>Plaintiff,<br><br>v.<br><br>**STANDARD INSURANCE COMPANY**,<br><br>Defendant. | Case No. 3:20-cv-75<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Jeremy L. Bordelon, EVERGREEN DISABILITY LAW, 465 NE 181st Ave., No. 500, Portland, Oregon 97230. Of Attorneys for Plaintiff.

Andrew Altschul, BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP, 921 SW Washington St., Suite 516, Portland, Oregon 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Norma Jean Stephens (Stephens) seeks reinstatement of her long-term disability (LTD) and other benefits under her employee benefit plan with defendant Standard Insurance Company (Standard). Stephens's former employer, Harbin Clinic, LLC (Harbin), which is not a party in this case, purchased from Standard the benefit plan at issue, and Stephens participated in the plan as part of her benefits package as a Harbin employee. The plan arises under the Employee Retirement Income Security Act (ERISA). Under 29 U.S.C. § 1132(a)(1)(B) and Rule 52 of the Federal Rules of Civil Procedure, Stephens moves for judgment on the

administrative record (AR). ECF 13 (Motion for Judgment on the Record). Standard opposes Stephens's Motion for Judgment on the Record and cross-moves for summary judgment. ECF 16 (Cross-Motion). Standard also moves to strike Stephens's Exhibit A, the transcript from the deposition of John Hart, M.D. (Dr. Hart). ECF 17 (Motion to Strike). For the reasons stated below, the Court GRANTS Stephens's Motion for Judgment on the Record and DENIES Standard's Cross-Motion for Summary Judgment and Motion to Strike.

## MOTION TO STRIKE

Stephens provides as Exhibit A to her Motion for Judgment on the Record a transcript from the deposition of Dr. Hart taken by attorney Terrence J. Coleman (Coleman) in an unrelated state court case, *Stiller v. Standard Insurance Company, et al*., No. CGC-14-537817 (Cal. Super. Ct., S.F. Cnty.). ECF 13-1. Standard moves to strike the deposition. Coleman provided a declaration, attached to Stephens' response opposing Standard's Motion to Strike (ECF 19), attesting to the authenticity of the transcript. ECF 19-1.

### A. Legal Standard

Under Rule 12(f) of the Federal Rules of Civil Procedure, the purpose of a motion to strike is to avoid spending time and money litigating spurious issues. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010); *see also Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)). The disposition of a motion to strike is within the discretion of the district court. *See Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990). "Motions to strike are disfavored and infrequently granted." *Legal Aid Servs. of Oregon v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008). Rule 12(f) provides that pleadings that are "immaterial" or "impertinent" may be struck by a court. An "immaterial" matter is "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc.*, 984 F.2d at 1527 (quoting C.

Wright, A. Miller, et al., 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed. 2013)). "Impertinent" matters

are those "that do not pertain, and are not necessary, to the issues in question." *Id.* Such

pleadings are legally insufficient because they clearly lack merit "under any set of facts the

defendant might allege." *Polk v. Legal Recovery L. Offs.*, 291 F.R.D. 485, 489 (S.D. Cal. 2013)

(simplified).

**B. Discussion**

When denying Stephen's appeal, Standard partially relied on an opinion by Dr. Hart. As

discussed in oral argument, Stephens seeks to use Dr. Hart's deposition from *Stiller* to impeach

Dr. Hart's opinion by showing that Dr. Hart is biased toward disbelieving subjective reports of

pain offered by disability claimants, and that his bias may be further influenced by his paid work

as a consultant for Standard and by Standard's "structural" conflict of interest. In *Stiller*,

Coleman deposed Dr. Hart regarding his adverse disability determination and his financial

relationship with Standard. Standard's asks the Court to strike the deposition transcript.

Standard's Motion to Strike concerns what extra-record evidence of a consulting physician's

alleged bias or conflict of interest this Court may consider. Neither party has cited (and the Court

has not found) any ERISA case decided in the Ninth Circuit in which a plaintiff has sought to use

extra-record materials to impeach a defendant's expert.

Standard makes three arguments in support of its Motion to Strike. First, Standard asserts

that the deposition lacks authentication and proper foundation. Second, Standard contends that

the deposition is beyond the scope of discovery that the Ninth Circuit permits in ERISA cases.

Third, Standard argues that the deposition is irrelevant.[1]

---

[1] Standard also argues that Stephens's arguments relating to the deposition are unsupported by the text of the deposition itself. This, however, goes to the weight of Stephens's arguments, not to the admissibility of Dr. Hart's deposition.

### 1. Authentication and Foundation

Standard concedes that Stephens has now authenticated the deposition transcript, but argues that she still has failed to provide a proper foundation for the deposition's admissibility as an exhibit. ECF 21 at 2. Standard cites Rule 32 of the Federal Rules of Civil Procedure, but Standard does not explain how Exhibit A fails to meet the requirements of that rule. Rule 32 provides that "a deposition may be used against a party" on the conditions that "the party was present or represented at the taking of the deposition or had reasonable notice of it," the deposition "is used to the extent it would be used under the Federal Rules of Evidence if the deponent were present and testifying," and "the use is allowed by Rule 32(a)(2) through (8)." The Court finds that Stephens's use of Exhibit A sufficiently comports with Rule 32: Stephens is using the deposition against a party, Standard, that was present and represented at the taking of the deposition;[2] Stephens is using the deposition to the extent it would be admissible under the Federal Rules of Evidence if Dr. Hart were present and testifying; and Rule 32 permits the use of a deposition for impeachment.

### 2. Extra-Record Discovery

Standard argues that the Hart deposition would is a form of extra-record discovery, the use of which would violate well-established law limiting the scope of discovery in ERISA cases. Not so. The transcript at issue is entirely unrelated to any limitations on discovery that ERISA or related case law may impose. *See, e.g., Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992) (explaining that a "primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously"

---

[2] Standard had two individuals present at the deposition: its attorney Linda M. Lawson, and Standard employee James N. Welty. ECF 13-1 at 1.

and that extra-record evidence could "seriously impair the achievement of that goal"). Thus, because Exhibit A is not "discovery" sought from Standard, the Court's failure to strike Exhibit A would not "completely undermine" the purpose of limitations on discovery in ERISA cases, as Standard argues.

### 3. Relevance

Courts generally admit extra-record evidence in ERISA cases only if that extra-record evidence relates to a specific issue narrowly and explicitly defined—notably, issues of bias or of conflict of interest. *See Nolan v. Heald College* 551 F.3d 1148 (9th Cir. 2009) (concluding that district court erred in rejecting, without bench trial or evidentiary hearing, ERISA claimant's extra-record evidence of consulting doctors' bias); *see also Fernandez v. Fort Dearborn Life Ins. Co.*, 2010 WL 11700665 (E.D. Cal. Apr. 13, 2010) (granting motion to compel answers to interrogatories that relate directly to the defendant insurance company's alleged bias and conflict of interest). Here, Stephens has specified precisely what extra-record material she wishes to use as evidence (Exhibit A) and how that material is relevant to her case, namely for impeachment of Dr. Hart.

## C. Conclusion

The Court DENIES Standard's Motion to Strike. ECF 17. The Court allows Stephens to use this extra-record evidence because it is authentic and a proper foundation has been shown; it does not conflict with the purpose of ERISA's limitations on discovery; and it is relevant to a specific and narrowly-defined issue.

## MERITS

When a court reviews a plan administrator's discretionary denial of benefits in an ERISA case, the proper standard is abuse of discretion. Some courts resolve this by summary judgment, but a "motion for summary judgment is merely the conduit to bring the legal question before the

district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006). "[W]hen deciding a motion for summary judgment, the court is forbidden to make factual findings or weigh evidence." *Rabbat v. Standard Ins. Co.*, 894 F.Supp.2d 1311, 1314 (D. Or. 2012). In contrast, in a case such as this one, the court must ask

> not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is most likely true.

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).

In at least two cases when ERISA plaintiffs have sued insurance-company defendants under disability benefit plans that gave discretionary authority to the plan administrator, as is the case here, this Court has conducted a trial on an administrative record. *See Rabbat*, 894 F.Supp.2d 1311; *Soich v. Aetna Life Ins. Co.*, 2017 WL 449171 (D. Or. Feb 2, 2017). The Court does the same here and makes the following findings of fact and conclusions of law, based on the administrative record before it, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**A. Findings of Fact**

1.      Harbin Clinic employed Stephens as a credentialing manager for 18 years. AR 104. In December 2013, Stephens underwent surgery for a ruptured fibroid tumor and ripped uterine lining. AR 362. By mid-2014, Stephens's doctors had prescribed medications for her nausea and chronic pain. *Id*. On May 4, 2015 Stephens elected to receive a laparoscopy, which her physicians performed the following month. AR 516. During a visit on May 12, 2015 with Richard J. Donadio, M.D., a specialist in spine and pain (AR 550), Stephens reported "increased low back and leg pain," "numbness in her left arm and leg," that "her legs burn and tingle," that "her pain is burning and she feels like she is on fire," and that "when she sits for long periods of

time her pain increases." AR 421. On June 3, 2015, Stephens stopped working for Harbin, due to her lower back pain, pelvic and abdominal pain, and left leg pain. AR 845, 848.

2.      After the June 2015 laparoscopy, Stephens reported symptoms that remained unchanged or had worsened. "Physical therapy is made dramatically worse recently," stated Erik Shaw, D.O., in his July 23, 2015 notes from his examination of Stephens. AR 473. Dr. Shaw continued, "sitting upright for long periods of time seems to make it worse." *Id*. Dr. Shaw did not "think there is any Magic bullet" to treat Stephens's pain. AR 474. He added, "I did discuss the case in detail with Dr. Donadio over the phone and hope overall we are in agreement." *Id*.

3.      During her pain management appointment with Dr. Donadio on August 27, 2015, Stephens continued to report burning, tingling, and numbness in her limbs, and feeling "like she is on fire." AR 441. Additionally, she was "dragging her left leg." *Id*. Dr. Donadio noted that Stephens

> continues to have pain that is multifactorial. This is a difficult and complicated situation. I am not sure where this is coming from but feel it is intrapelvic for the most part and possibly to a lesser extent and less likely the spine....She has scar tissue and adhesions that may be affecting the lumbosacral plexes.

*Id*.

4.      On September 4, 2015, Dr. Donadio completed a questionnaire that Standard provided. AR 549-50. Dr. Donadio listed ten dates on which Dr. Donadio treated Stephens between June 2014 and August 2015. *Id*. Dr. Donadio concluded that Stephens "is unable to work regardless of work modifications" and that she "is totally and permanently disabled." AR 550.

5.      On September 5, 2015, Stephens completed her application for LTD benefits under Standard's plan. AR 848-50; AR 10-41. A claims analyst for Standard interviewed Stephens on September 24, 2015. AR 839-40. During the interview, Stephens recounted her

2013 emergency hysterectomy, explained the "continued ongoing pain in her abdomen, legs and back," and told the analyst that "the pain in her abdomen increased with sitting for long periods of time and the pain in her legs and back was increased by standing." AR 839. Stephens "described this pain as tingling, numbing, and burning. She also advised a trip to the doctor's office will make her feel like she has a stomach full of gasoline when she gets home." *Id*. Stephens stated that "she can't sit for long periods due to the pain," "could not run," and "she no longer attended church due to the sitting and was most comfortable laying down." *Id*. Stephens added that "sometimes just the act of showering wipes her out and she needs to lay down." AR 840.

6.     Before making a decision, Standard consulted three times in 2015 with Oded Shulsinger, M.D. The first consultation was in October (AR 477-80), the second in November (AR 466-67), and the third in December. AR 383-85. When Dr. Shulsinger prepared his reports, he reviewed Stephens's medical records but did not personally examine Stephens or even speak with her. In his October report, Dr. Shulsinger stated that Stephens "would have short limitations and restrictions to recover from her laparoscopic surgery," from which Dr. Shulsinger believed that Stephens "should be able to recover in 2 weeks and return to her sedentary level occupation." AR 479. Dr. Shulsinger opined that Stephens "can sit for the predominance of the day . . . exert up to 10 pounds of force occasionally . . . [and] she can walk and stand for short periods of time and carry, push, and pull objects." *Id*. Dr. Shulsinger also mentioned that it would be useful for Stephens to follow up with a neurologist. *Id*.

7.     In response to Dr. Shulsinger's comment, another claims analyst for Standard called Stephens on October 28, 2015 to inquire about any recent neurology work. AR 820-21. Stephens stated that she had not seen a neurologist after she had stopped working. AR 820.

Stephens told the claims analyst that she had previously seen a neurologist "in 2014 concerning her abdominal/pelvic pain, but nothing was done for her and Dr. Koganti (neurologist) ruled out back pain for her, noting that she had nerve pain. She did not feel that Dr. Koganti's records would offer anything concerning her current condition." *Id*. During the conversation, Stephens described the history of her condition and the pain from which she suffered, in terms consistent with her prior statements to Standard and her physicians. *Id*.

8.      Dr. Shulsinger's October report characterized Stephens's occupation as sedentary, but a Standard vocational case manager determined that Stephens's job required light strength. AR 874. Standard then asked Dr. Shulsinger to clarify his position, keeping in mind Stephens's light, not sedentary, occupation. Dr. Shulsinger provided Standard with an addendum in November 2015. AR 466-67. Dr. Shulsinger again wrote that Stephens "would have short-term limitations and restrictions to recover from her laparoscopic surgery," but the doctor added that, "to further evaluate limitations and restrictions, we would need additional documentation after August 1, 2015." AR 466.

9.      In response to Dr. Shulsinger's November addendum, Standard provided the doctor with Stephens's records after August 2015 and asked him for an updated opinion, which Dr. Shulsinger provided in a December 2015 report. AR 383-85. In the December report, Dr. Shulsinger concluded that Stephens "is unable to do her light level occupation due to her chronic pain syndrome." AR 385. "It is somewhat unclear as to the etiology of the pain syndrome, but there is documentation that the claimant is having significant pain which so far has not responded well to treatment and is on multiple medications." *Id*. Dr. Shulsinger stated that Stephens's pain was "possibly intrapelvic in nature, possibly due to scar tissue." *Id*. He

added that he "would like to review the file in several months" and that "she may need further evaluation by either an FCE or an IME."[3] *Id.*

10.    Standard approved Stephens's application for LTD benefits on December 22, 2015. AR 593. Standard sent Stephens an approval letter dated December 23, 2015. AR 694-97. Standard's letter stated: "After a period of time the definition of disability may change, which would require a review of your claim." AR 696. Standard paid the first two years of Stephens's LTD benefits, having found her unable to perform her "Own Occupation," which is Standard's definition of disability during the first two years of an LTD plan. AR 593. *See also* AR 19; AR 571-73.

11.    On August 24, 2016, a second consultant retained by Standard, Edward Wolff, M.D., reviewed Stephens's medical records. AR 260-62. Like Dr. Shulsinger, Dr. Wolff never examined or spoke with Stephens. In his report, Dr. Wolff stated: "The chronicity of this claimant's pain bodes poorly for eventual permanent relief." AR 261. He added that Stephens

> is currently likely for limitations and restrictions of sedentary capacity without prolonged sitting[;] with no bending, twisting, climbing, balancing, stooping, crouching and crawling[; and] with no lift, carry, push or pull greater than 10 pounds with occasional standing and walking with the ability to change position as needed.

Id.

12.    Dr. Wolff then "suggested that a current Pain Questionnaire be produced for evaluation for subsequent determination of limitations and restrictions as well as current results of office visits and any diagnosis and therapeutic planning." *Id*. He added: "An FCE has been discussed and may become a possibility." *Id*.

---

[3] "FCE" refers to a functional capacity evaluation and "IME" refers to an independent medical examination.

13.     In a letter dated September 2, 2016, Standard informed Stephens the plan's "Definition of Disability will change after 24 months, according to the Group Policy. To be eligible for benefits, you must be disabled as defined by the Group Policy." AR 571. The letter explained that Stephens's LTD benefits had first become payable September 2, 2015, and that during the first two years of her LTD coverage "you are eligible for benefits as long as you remain unable to perform your Own Occupation as a Credentialing Manager." AR 573. Standard's letter also stated that "[b]ecause the Definition of Disability will change on September 02, 2017, we need to evaluate your ability to perform another occupation beginning that date. We will analyze medical and vocational information available to us." *Id*.

14.     On October 5, 2016, Dr. Donadio prescribed a wheelchair for Stephens to use. AR 117. A few days later, Dr. Donadio completed a statement for Standard, titled Physician's Report–Musculoskeletal. AR 119. Asked to identify barriers to Stephens's return to work, Dr. Donadio stated that "chronic pain" keeps Stephens "in bed most of day," and, asked when he anticipated Stephens could return to work, he wrote "Never." *Id*. This report included a check-the-box form in which Standard asked Dr. Donadio to characterize the frequency with which Stephens would be able to perform various tasks or physical movements. AR 120. Dr. Donadio stated that Stephens could occasionally sit, stand, walk, and balance; and that she could never[4] bend, kneel, crawl, climb, drive, walk on uneven surfaces, or reach at or above shoulder level. *Id*. Dr. Donadio stated that Stephens could occasionally lift, carry, push, and pull under ten pounds, but never greater than ten pounds. *Id*.

---

[4] Standard's check-the-box form included three categories: continuously (67-100%), frequently (34-66%), and occasionally (1-33%), plus a fourth column titled "OTHER (explain)." AR 120. Standard did not include "never" as an option. Dr. Donadio used Standard's "OTHER" column to write in "never".

15.     Standard requested that its consultant Dr. Wolff clarify his August 2016 report. Dr. Wolff did so in a supplemental report dated February 15, 2017. AR 221-22. Standard asked Dr. Wolff to explain his reasoning for Stephens's "limitations and restrictions in sedentary capacity without prolonged sitting." AR 221. Dr. Wolf explained that Stephens "had been working with some degree of pain prior to her incur date, and that she worked . . . through her pain from December 2013 to June 2015." *Id*. He stated that Stephens's "motivation is credible, and it is documented that she worked through her pain. . . . Without this motivation, limitations and restrictions might have been considered less than sedentary." *Id*.

16.     Standard also asked Dr. Wolff to review updated medical records and list Stephens's current limitations and restrictions. *Id*. Dr. Wolff told Standard that he had called Dr. Donadio, and that in their phone conversation, Dr. Donadio stated that he

> knows the claimant for many years and that she spends most of her time in bed. He further stated that the claimant is highly motivated and wants to work and would work if she could. He feels that the claimant does not even [have] sedentary capacity.

AR 221-22. Based on his conversation with Dr. Donadio, Dr. Wolff concluded that Stephens "has no sustainable functional capacity from the incur date of June 03, 2015 to the current time and that this case should be reviewed within 6 to 12 months." AR 222.

17.     Consulting doctor Charles Glassman, M.D. wrote a report for Standard on July 17, 2017. AR 126-28. Like Drs. Shulsinger and Wolff, Dr. Glassman reviewed Stephens's medical records but never examined or spoke to Stephens. *Id*. Unlike Drs. Shulsinger and Wolff, however, Dr. Glassman did not recommend that Standard examine Stephens using an IME or FCE; and unlike Dr. Wolff, Dr. Glassman did not speak to a physician who had treated or examined Stephens. Dr. Glassman reviewed Stephens's medical records from March 2014 to

June 2017. His report expressed doubt as to the objective medical evidence supporting

Stephens's subjective pain symptoms. Dr. Glassman wrote:

> There is no medical documentation to confirm an anatomical or
> physiological etiology of the claimant's reported symptoms. . .
> There are no EMG or nerve conduction velocity studies to confirm
> any type of nerve involvement as a possible etiology of the
> claimant's symptoms. The claimant reports that she is in bed all
> day except for going to the bathroom. There is no indication on
> any of the physical examinations from any of the doctors over the
> last three years of significant abnormal physical findings.

AR 127.

18. Dr. Glassman notes that Dr. Donadio's analysis that bending and twisting

aggravated Stephens's symptoms, but Dr. Glassman stated that "these movements would imply

some anatomical dysfunction leading to aggravating of the pain, although there is no medical

documentation of that." *Id*. Asked by Standard for diagnoses supported by medical

documentation, Dr. Glassman listed only chronic pain. *Id*. He stated: "There is no medical

documentation that would explain the claimant's inability to get out of bed except to go to the

bathroom." *Id*. He added: "Given that her reported symptoms are so extreme, it is my opinion

that the claimant may have some physical limitations and restrictions, although not supported by

medical documentation." *Id*.

19. Some of Dr. Glassman's restrictions are the same as those recommended by

Dr. Donadio in his October 2016 report for Standard, discussed above and at AR 119-20.

Drs. Donadio and Glassman's recommendations differed, however, in the following ways:

Dr. Glassman stated that Stephens "can sit constantly as long as she has the ability to change

positions and rest," (AR 127); "can less than occasionally twist, turn, crouch, crawl, squat, stoop,

kneel, and bend" (AR 128); can frequently reach, and occasionally walk on uneven surfaces

(*Id*.); and, Dr. Glassman advised that Stephens could drive, but that she avoid driving while

drowsy. *Id*. In addition to her wheelchair, on August 8, 2017, Dr. Donadio also prescribed a "rollator walker with seat" for Stephens. AR 118.

20. In a letter dated August 11, 2017, after paying Stephens's LTD benefits for two years, Standard denied Stephens's disability claim. AR 564-68. The August 2017 letter told Stephens that "[t]o remain eligible for LTD benefits after the first 24 months of LTD benefits have been paid, you must be unable to perform Any Occupation. This was explained in our letter to you dated September 2, 2016." AR 564.[5] Although Standard's August 2017 denial letter does not mention Dr. Glassman by name, the letter lists limitations that are consistent with those identified by Dr. Glassman. AR 127-28, 565-66. The denial letter's restrictions and limitations, however, are *inconsistent* with those listed by Drs. Donadio and Wolff. AR 119-20, 260-62, 221-22. In the most recent of Dr. Shulsinger's reports, dated December 16, 2015, the doctor did not list specific limitations for Stephens. AR 383-85.

21. Standard argues that it based its decision on Dr. Glassman's assessment and on the three sedentary occupations that Standard's vocational consultant identified for Stephens. AR 566. Standard's denial letter, in closing, explains Stephens's rights to appeal, including her right to file suit against Standard after she had exhausted her administrative remedies. AR 567.

22. Dr. Donadio stated, after an October 2, 2017 visit, that Stephens "is totally and permanently disabled." AR 115. Dr. Donadio lists Stephens's diagnoses as chronic pain

---

[5] Standard's "Any Occupation Definition of Disability" states that "You are Disabled from all occupations if, as a result of Physical Disease [or] Injury . . . you are unable to perform with reasonable continuity the Material Duties of Any Occupation." AR 20, 572-73. Standard defines "Any Occupation" as any job "you are able to perform, whether due to education, training, or experience . . . in which you can be expected to earn at least 80% of your Indexed Predisability Earnings." *Id*. It defines Material Duties as "essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted." *Id*.

syndrome, low back pain, abdominal pain, pain in pelvis, pain in limb, displacement of lumbar

intervertebral disc, and long-term drug therapy. *Id*. He prescribed or renewed the prescriptions

for six medications: hydrocodone, acetaminophen, clonazepam, topiramate, Robaxin, and

extended-release morphine, and he counseled Stephens on risks and benefits of the narcotics. AR

115-16.

23.     On October 5, 2017, Stephens sent an email to a disability benefits analyst for

Standard, asking that Standard "accept this notice as request to file an appeal to the August 11,

2017 decision to close my LTD claim." AR 719. Stephens added that she would provide

Standard with additional information to review her claim. *Id*. In a letter dated November 17,

2017, Stephens timely appealed. AR 110-13. In her appeal, Stephens states that, before the onset

of her chronic pain, she and her husband had been active in their church community, and that she

had been very family oriented and did lots of entertaining. AR 112. By the time of the appeal,

Stephens states, she spent most of the day bedridden, using her wheelchair to get to the restroom.

*Id*. She described herself as "in near constant pain" and stated that working in a "sitting position

for any length of time is impossible" because a sedentary position "causes the pain in my back

that radiates down my leg to the level of being unable to walk and increased muscle spasms." *Id*.

Stephens added: "Standing for any length of time causes the stomach and pelvic pain and the

muscle spasms" which, at that time, were "worsening daily." *Id*. She continued:

> I also understand there are many, many in this life that can
> honestly work, but for whatever reason, find they had rather live
> their life letting others support them. I am aware that the review
> committee/physicians do not know me personally; and I respect
> their position. I worked 20+ years in an administrative
> management position, I can honestly say I loved and was dedicated
> to my job and felt I contributed to making a difference to society
> by my role in the work force.

*Id*. On November 28, 2017, Standard received and began to process Stephens's appeal.

24.      In response to Stephens's appeal, Standard hired John Hart, D.O., a fourth consultant, to review Stephens's medical records. Dr. Hart provided a report dated December 1, 2017. AR 90-93. Like Drs. Shulsinger, Wolff, and Glassman, Dr. Hart never examined or even spoke with Stephens. Unlike Dr. Wolff, Dr. Hart did not contact Stephens's treating or examining physicians.

25.      Dr. Hart provided the least-restrictive limitations for Stephens of any physician discussed in the record. AR 92. Dr. Hart states that Stephens can lift "10-15 pounds on an occasional basis, lesser amounts on a more frequent basis" and that "she is capable of standing or walking at a frequent level." *Id*. He adds that nothing "would preclude her from reaching, handling, grasping, fingering, and keyboarding. . . . It is my . . . opinion that she is capable of carrying out the above vocational activities at a full time basis." *Id*. Dr. Hart is the only physician mentioned in the record to have opined so few limitations on Stephens's abilities.

26.      In addition, Standard asked Dr. Hart whether Stephens's symptoms were consistent with the medical evidence. *Id*. Dr. Hart replied, "No. Her complaints are not consistent,"[6] because Dr. Donadio "did not find any significant abnormalities," "[t]he neurologist's examinations were normal," and, while health care providers suspected that Stephens may have fibromyalgia, "[t]he medical records do not document a clinical examination that would be fully consistent with fibromyalgia." *Id*.

27.      Standard's appeals process involved an review by individuals not associated with the original claims process. AR 711-12. By letter dated December 13, 2017, Standard denied

_____

[6] When Dr. Hart characterized Stephens's complaints as "not consistent," the Court understands Dr. Hart to have been indicating that he did not find an objective medical explanation for Stephens's subjective reports of pain. Standard has not identified, nor has the Court found, any evidence in the record of internal inconsistencies within Stephens's own reports of her subjective pain symptoms.

Stephens's appeal. AR 710-13. Standard explained that Stephens had the right to file a lawsuit challenging the decision. AR 713.

28.     An internal email by a benefits review specialist at Standard noted that, on January 4, 2018, the specialist and Stephens spoke by telephone. AR 709. In that call, Stephens stated that "she is totally disabled and that her doctors [have] deemed her permanently disabled." *Id*. Stephens added that "she was advised that the Standard would make up the difference after SSDI until age of 65." *Id*. Standard's benefits review specialist "advised at this point that [Stephens] would have to file a lawsuit," and Stephens "stated that she will do so." *Id*. Having exhausted her administrative remedies, Stephens filed her complaint on January 13, 2020.

**B. Conclusions of Law**

1.     Because Standard's plan grants discretion to the plan administrator or fiduciary to determine Stephens's eligibility for benefits or to interpret the terms of the plan, AR 36, the Court reviews the plan administrator's decision for abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989) ("Trust principles make a deferential standard of review appropriate where a trustee exercises discretionary powers."). Here, the "trust" is Standard's ERISA-qualifying benefits plan, and the "trustee" is Standard's plan administrator. "[A] deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation of the plan will not be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (internal quotation marks omitted).

2.     An insurance company has a structural conflict of interest when it acts as both claims administrator and claims payor, *i.e.*, when the company both decides whether a claimant qualifies for benefits and is responsible to pay those benefits if it determines that the claimant

qualifies. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). In *Glenn*, the Supreme

Court explained:

> The employer's fiduciary interest may counsel in favor of granting
> a borderline claim while its immediate financial interest counsels
> to the contrary. Thus, the employer has an interest conflicting with
> that of its beneficiaries, the type of conflict that judges must take
> into account when they review the discretionary acts of a trustee of
> a common law trust.

*Id.* (simplified). Further, "the fact that a settlor (the person establishing the trust) approves a

trustee's conflict does not change the legal need for a judge later to take account of that conflict

in reviewing the trustee's discretionary decisionmaking." *Id.* at 113.

3.      In *Glenn*, the Supreme Court stated two reasons that a conflict exists when an

insurance company acts as both claim decider and payor in ERISA cases. First, "[a]n employer

choosing an administrator in effect buys insurance for others and consequently (when compared

to the marketplace customer who buys for himself) may be more interested in an insurance

company with low rates than one with accurate claims processing." *Id.* at 114. Second, "ERISA

imposes higher-than-marketplace quality standards on insurers." *Id.* at 115. Thus, ERISA "sets

forth a special standard of care upon a plan administrator . . . that the administrator discharge its

duties in respect to discretionary claims processing solely in the interests of the participants and

beneficiaries." *Id.* (simplified), quoting ERISA §1104(a)(1). Thus, Standard has a structural

conflict of interest that this Court must weigh in making its decision. *See Abatie*, 458 F.3d at 965

(9th Cir. 2006) ("[A]n insurer that acts as both the plan administrator and the funding source for

benefits operates under what may be termed a structural conflict of interest").

4.      Weighing a structural conflict of interest shifts a court's standard of review to be

somewhat less deferential to the defendant insurance company. Typically, "a modicum of

evidence in the record supporting the administrator's decision" means that a court, reviewing for

abuse of discretion, must find for the insurance plan administrator. *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 626 (9th Cir. 2009). In the presence of a structural conflict of interest, however, a modicum of evidence "will not alone suffice," because "traditional application of the abuse of discretion standard allows no room for weighing the extent to which the administrator's decision may have been motivated by improper considerations." *Id*. Previous cases have "held a decision is not arbitrary unless it is not grounded in any reasonable basis" but today, the Ninth Circuit understands that "[t]his '*any* reasonable basis' test is no longer good law when as in this case an administrator operates under a structural conflict of interest." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673-74 (9th Cir. 2011) (emphasis in original).

5.      Standard argues that its consulting doctors demonstrated independence through statements of impartiality in their respective reports. Each of these statements of impartiality contains identical or near-identical boilerplate language. AR 93, 128, 261-62, 479-80. Standard does not explain how such boilerplate text would absolve it of its structural conflict of interest. Only changes to the structure of Standard's plan administration could remove or mitigate structural conflict.

6.      *Abatie* provided examples of exactly what sorts of structural change an insurance plan administrator would need to make for a court to find that the company's conflict of interest is, as *Glenn* would later put it, "less important (perhaps to the vanishing point)." *Glenn*, 554 U.S. at 117. In *Abatie*, the Ninth Circuit stated:

> For example, the administrator might demonstrate that it used truly
> independent medical examiners or a neutral, independent review
> process; that its employees do not have incentives to deny claims;
> that its interpretations of the plan have been consistent among
> patients; or that it has minimized any potential financial gain
> through structure of its business (for example, through a retroactive
> payment system).

*Abatie*, 458 F.3d at 969 n.7. The Supreme Court in *Glenn* also provided examples of what insurance companies could do to reduce the weight that courts must give to their conflict of interest. *Glenn* explains that conflict of interest is less important

> where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117.

7.     Even if the Court were to assume that these boilerplate statements accurately reflect the consulting doctors' impartiality, that assumption would not fully address the structural conflict of interest that concerned the Supreme Court in *Firestone* and *Glenn*. Standard does not show that it has taken any of the other steps described by the Ninth Circuit in *Abatie* and the Supreme Court in *Glenn* to mitigate the effect of its structural conflict of interest.

8.     Standard also argues that a plaintiff, or claimant, must show that the structural conflict of interest negatively affected the plan administrator's decision in a specific case before a court may consider the defendant's conflict, and that Stephens has presented no evidence that Standard's conflict had any effect on its decision in her case. The Ninth Circuit rejected prior case law that required a plan participant to "present 'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused the breach of the administrator's fiduciary obligations to the beneficiary.'" *Abatie*, 458 F.3d at 965 (quoting *Atwood v. Newmont Gold Co*, 45 F.3d 1317, 1323 (9th Cir. 1995). This rejection was, in part, a result of the "unreasonable burden" that such a requirement places on ERISA plaintiffs and the Supreme Court's requirement that the court weight a conflict of interest in its abuse of discretion review. *Abatie*, 458 F.3d at 966. Standard's approach, like the overruled *Atwood* approach, "places on plan participants the burden of producing evidence of the plan

administrator's motives, evidence that an ERISA plan participant is much less likely to possess than is the administrator." 458 F.3d at 967. Thus, even if Stephens cannot show a link between Standard's structural conflict of interest and its denial of her benefits, the Court still must weigh the conflict as a factor in determining whether the plan administrator abused its discretion.

9.      Standard's denial of Stephens's benefits was arbitrary and capricious and unsupported by the administrative record. First, Standard never hired consultants to examine Stephens in person, despite two of Standard's reviewing physicians recommending that Standard do so. Second, Standard's denials relied on the reports of doctors who disfavored a disability finding and relied little or not at all on the opinions of doctors who favored a disability finding. In addition to showing arbitrary and capricious decision making, these factors indicate that Standard may have let its conflict of interest improperly influence its decision in Stephens' case.

10.     Standard hired four consultants to review Stephens's medical records. They were Drs. Shulsinger, Wolff, Glassman, and Hart. As previously noted, however, none of these physicians ever examined Stephens or even spoke to her. Only one, Dr. Wolff, spoke with a doctor who had examined and treated Stephens. After that conversation Dr. Wolff changed his opinion to reflect greater limitations on Stephens's ability to work. Standard correctly points out that ERISA does not require it to hire consultants to examine claimants. The law permits plan administrators to rely on consultants who merely review a claimant's medical records without ever examining or even speaking with the claimant. Standard is also correct that, unlike pre-2017 Social Security regulations, the ERISA statute does not stratify medical evidence to place treating physicians at the top, examining physicians in the middle, and reviewing physicians at the bottom of a persuasiveness hierarchy. When the Supreme Court confronted these questions in *Black & Decker Disability Plan v. Nord*, it held that, unlike the Social Security commissioner, an

ERISA plan administrator need not accord different weights to treating, examining, and reviewing physicians' reports. 538 U.S. 822, 834 (2003).

11.     That said, "whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records" is one of the "factors that frequently arise" for courts to consider in the ERISA context. *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009). Particularly in cases in which the plan administrator has a conflict of interest, in deciding whether a plan administrator abused its discretion, courts must consider as a factor the administrator's decision to conduct a "pure paper" review where consultants do not examine the claimant in person. *Montour*, 588 F.3d at 634; *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011), *Robertson v. Standard Ins. Co.*, 139 F. Supp. 3d 1190, 1204 (D. Or. 2015).

12.     Here, two of Standard's own consultants recommended that it hire doctors to physically examine Stephens, but Standard never did so. In his December 2015 report, Dr. Shulsinger advised Standard that he "would like to review the file in several months" and that Stephens "may need further evaluation by either an FCE or an IME." AR 385. Standard, however, did not have Dr. Shulsinger review Stephens's records after that December 2015 report, and Standard never retained anyone to perform an FCE or IME on Stephens. Similarly, in his August 2016 report, Dr. Wolff stated that "[a]n FCE has been discussed and may become a possibility." AR 261. It is unclear from the record with whom Dr. Wolff "discussed" the need for an FCE for Stephens, but it is undisputed that an FCE never was obtained.

13.     If consultants had examined Stephens in person, they could have provided both Standard and the Court with additional context and perspective on the etiology of Stephens's pain, which treating physician Dr. Donadio described as totally and permanently disabling.

AR 115. Drs. Glassman and Hart, on whom Standard relied in its denials of Stephens's claim and appeal, both expressed concerns about a lack of objective medical findings to support Stephens's subjective pain symptoms. AR 127; AR 104. It is significant that Drs. Shulsinger and Wolff encouraged Standard to retain physicians to examine Stephens in person, but Standard declined to follow this recommendation. The only reason Standard provides for its decision not to retain examining physicians is that the law does not require it to do so. Standard spent time and money on four consulting doctors, two of whom provided at least three reports each. Standard has offered no persuasive explanation, however, for why it declined to carry out a physical examination of Stephens, given its concerns about lack of objective evidence to support Stephens's subjective pain symptoms.

14. The Court concludes that when Standard relied its four non-examining consultants, while ignoring the recommendation that an IME or FCE be obtained, Standard's choice was an arbitrary and capricious abuse of discretion, likely influenced by a structural conflict of interest that favors denying claims over accurately and fairly resolving them. Additionally, Standard abused its discretion by relying primarily or entirely on Drs. Glassman and Hart, the two physicians who provided the fewest restrictions on Stephens's ability to work. Standard sought several clarifications and addenda from Drs. Shulsinger and Wolff, but Standard does not appear to have relied significantly on Drs. Shulsinger or Wolff's more-restrictive reports in its denial decisions. This, too, indicates that Standard arbitrarily and capriciously relied on reports of doctors whose conclusions matched the result that would be least costly, *i.e.*, denying an expensive claim.

15. In overturning a defendant insurance company's denial of a plaintiff's benefits, a court has two choices: it may remand to the plan administrator for further consideration, or it

may order that the defendant reinstate the plaintiff's benefits. "Remand to the plan administrator is appropriate where that administrator has 'construe[d] a plan provision erroneously' and therefore has 'not yet had the opportunity of applying the [p]lan, properly construed, to [a claimant's] application for benefits.'" *Canseco v. Constr. Laborers Pension Tr. for S. Cal.*, 93 F.3d 600, 609 (9th Cir. 1996) (alterations in original) (quoting *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996)). Here, it would be inappropriate to remand for further consideration because Standard already had the opportunity to apply the plan, which was properly construed.

16.      Ordering a reinstatement of benefits is appropriate when a plan administrator abuses its discretion by denying a disability claim that was supported by the record. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 172 (6th Cir. 2007) (holding that plan administrators "need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance"); *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 832 (7th Cir. 2004) ("It would be a terribly unfair and inefficient use of judicial resources to continue remanding a case to the Committee to dig up new evidence until it found just the right support for its decision to deny an employee her benefits"). The Court concludes that the record supported Stephens's disability claim and that Standard abused its discretion in denying Stephens's benefits. The appropriate remedy, therefore, is to order Standard to reinstate Stephens's benefits.

17.      The record shows that Stephens's pain is disabling, difficult to treat, and prevents her from working on even a part-time basis or at a sedentary capacity. Stephens can sit occasionally at most, and some days not at all. *See, e.g.*, AR 120. Chronic pain prevents Stephens from sitting for any length of time. AR 112, 421, 473, 839-40. Doctors have placed limitations on Stephens's ability to sit. AR 119-20, 221, 261. Stephens cannot do sedentary work because of

"the commonsense conclusion . . . that an employee who cannot sit for more than four hours in an eight-hour workday cannot perform 'sedentary' work that requires 'sitting most of the time.'" *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016). Stephens is incapable of even sedentary work and thus meets Standard's "Any Occupation" definition of "disability."

## CONCLUSION

The Court GRANTS Stephens's Motion for Judgment on the Record (ECF 13) and DENIES Standard's Cross-Motion for Summary Judgment (ECF 16) and Motion to Strike (ECF 17). Stephens is entitled to benefits under the terms of Standard's plan, and the Court ORDERS Standard to reinstate Stephens's benefits. The parties shall meet and confer to address the specific amounts of back benefits owed, as well as reasonable attorney's fees and costs to be awarded. If appropriate, the parties shall submit to the Court a stipulated proposed judgment. If the parties are unable to agree on all outstanding issues within 28 days of these Findings of Fact and Conclusions of Law, the parties shall file a joint statement of all issues that need further resolution by the Court, along with a proposed briefing schedule.

**IT IS SO ORDERED**.

DATED this 21st day of May, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge